We will hear argument next in number 2011, 11.05, KINETIC CONCEPTS AGAINST SMITH & NEPHEW. I suppose it's actually Wake Forest University against Smith & Nephew at this point. We'll wait just a minute and let everybody get settled in, ready to go. Okay, I think we're ready, Mr. Powers. Thank you, Your Honor. May it please the Court. I believe the most significant issue on this appeal is the question of the standard of review. As you read page two of the red brief, Appellees do not seek to defend the judgment below based on the traditional paths by which this Court has found obviousness as a matter of law. In the past, this Court has found obviousness as a matter of law either where it found, after a jury verdict, that there was not substantial evidence to support the explicit or implicit fact-finding by that jury. That is not the ground upon which Appellees seek to defend this judgment. Or second, where the invention at issue is simply a combination of old elements reacting in predictable and reliably understood ways. That is also not defensible on this record. Instead, what Appellees do, their only real attempt to defend the judgment below, is by flipping the standard of review, by arguing that this Court must pay deference not to the jury's explicit and implicit fact-finding, but to the Court's explicit and implicit fact-finding on Jamal. The stated basis for that flipping of the traditional standard of review is an argument that now this jury verdict should be looked at under Rule 49A, as opposed to a regular jury verdict, which is in fact how it was argued below. Well, let's assume that you're right about that. What strikes me is that there's a significant claim construction issue in this case, which the parties haven't really addressed completely. And that is, what does it mean to talk about a selected stage of healing? If these claims had been written to say until the wound is healed, we'd have a very different situation. But that's not the way the claims are written. It talks about a selected stage of healing. So in order to determine whether there's obviousness here, it seems to me that we have to look at that claim limitation and determine what it means. And it would seem as though it's any stage of healing that's selected by the physician. I mean, what other meaning does it have? Your Honor is correct that that issue was not joined below or on appeal. Your Honor is also correct that that is a claim term in sum, but not all of the claims at issue. The distinction that was argued below did not depend on the distinction that Your Honor is raising, but rather the distinction between draining a wound and healing a wound. So in our view, the key issue is not the selected stage portion of the particular claim language that Your Honor is addressing, but the concept of healing versus draining. There is, I think, no reasonable debate that that was the battle below. The battle below with respect to obviousness was that all of the prior references relied upon there and here did address using pump suction and other things of different pressures, different degrees of sealing, and I want to get to that in a minute, but not for the purpose of healing. And in fact, each of them removed those devices once the wound was drained. For the purpose of it? But Bagnatanoff, for example, talks about the forming of granulation tissue. Why isn't that a selected stage of healing? Bagnatanoff actually does not say that that was his purpose. He noticed that at some point after removal – I'm sorry? It happened. It happened after removal of his device. So the question, the problem is that the prior art doesn't have the same purpose? Is that what we're arguing about here? Not really. What we're saying is that they were used for a different reason and had a different effect. And the conventional wisdom of the time, and on this point I think there is no meaningful debate. Their own experts conceded this. The conventional wisdom of the time is that the core of this invention, i.e. using a vacuum with a sufficient pressure, and I don't want us to forget the amount of the pressure because we're going to get there hopefully, was the method by which you produced this granulation. The conventional wisdom of the time was that that amount of pressure or vacuum around a wound would damage the wound. It would inhibit granulation. I'm confused. I mean here you have this prior art which talks about draining the wound and talks about achieving some granulation. Why isn't that a selected stage of healing? Because the device was removed after drainage and before it produced healing. Well, complete healing, but that's why it's so important to know what selected stage of healing means. Your Honor appears to be arguing for an anticipation, which no one in this case is arguing for. I'm talking about what – it's not anticipation because there are other variables here. But in terms of this one claim limitation, selected stage of healing, you drain the wound, some granulation tissue is formed. Why can't that be a selected stage of healing? I understand Your Honor's question, but that goes to the issue of what is the teaching of Bogdanov. Not a stray sentence in Bogdanov where he notices that in one of the references granulation had occurred after the device was removed. It goes to a core factual question in the Graham Factors, which is what is the content of the prior art? What is its teaching as a whole? And the evidence in this record is that the teaching of Bogdanov as a whole is you do not use pressure after drainage. Well, there may be a teaching away argument, but in terms of what Bogdanov discloses, it discloses achieving a selected stage of healing, doesn't it? It says what we've both said it says. What it discloses and what it teaches is a question of fact. That question of fact is presumed to have been found against the question that the appellees are raising by the jury's verdict of obviousness. And the only question then – that's why it comes down to the standard review. If the standard review is the traditional standard of review, as it is for the reasons we've described, the question then before this court is whether there is substantial evidence to support that jury's implied finding. But the question is was there any evidence that Bogdanov didn't achieve draining the wound in the formulation of some granulation tissue? I don't understand that there was any contrary testimony about that. Everybody seemed to agree that that's what Bogdanov achieved. With respect, I don't think that's quite the right question. Your Honor's right that Bogdanov disclosed exactly what we've both said it discloses, that you remove it after drainage, and he noticed after removal that there was some granulation. The question then arises, what's the teaching of Bogdanov? Does it teach that you do it to form granulation, which is really what this invention is about? The answer is no. He removed it because he thought it would inhibit granulation. That evidence is all over this record, cited in the blue brief and the gray brief repeatedly. That evidence is substantial evidence to support the jury's implied finding. Your Honor appears to be asking the flip question, which in my view is the wrong question given the right standard review. The question that you began with of whether this is a Rule 49A case is one I'd like to focus on. Now, the motion that was made by Smith and Nephew for this process was made explicitly under 49A. It was, and it was denied. I'm sorry? And it was denied. Well, that's really my question. Once that motion was put on the table, did what the district court do with it convert this case into, in effect, a 49B case in your view? Yes. And walk me through how that happened procedurally in the sense that what was it that the judge did that rendered this a 49B case as opposed to the requested 49A case? There are two answers to that question, two things that are critical to the answer to that question. 49A by its terms require that if you're going to follow 49A, the logic of 49A is that each, quote unquote, that is in the Rule, each factual question must be put to the jury. The whole theory behind 49A is you give the jury every factual question they're supposed to decide, you take that factual input, and the court then applies law to fact. And that's what they proposed initially when they had that extensive list of questions that they wanted to go through. Precisely. And what happened, the answer to Judge Bryson's question is both parties then heard what the judge said, prepared very, very lengthy verdict forms, dozens of pages. The judge looked at those lengthy, lengthy verdict forms and said, I'm not going to give the jury something that long. Sent them off to a hotel room at 10 o'clock at night and said, come up with something that's 300 words or less. 300 word directive, right. And they came back, that was unreported, there's no statement about what happened in the dark of night in that hotel room. But the next day what we had is a few questions plus the ultimate question of validity. And Quaker City and other cases and logic are undeniably, inescapably clear that when you give the ultimate question, all subsidiary factual questions, explicit and implicit, are deemed to have been found in favor of the verdict holder. Of course, the ultimate question of law is advisory, naturally, because it's a question of law. But once you do that, Quaker City says, you're bound by that ultimate question. And logic tells you that. Because 49A realistically only applies if you do give the jury all the factual questions. If you don't, because you think the verdict form is too long, you can't then impose on a party that has rightfully requested a jury trial, which has an undeniable right to a jury trial on those factual questions. You cannot deprive them of that jury trial because you say you don't want a long verdict form. So you can't impose a waiver of the right to jury, and that was not done here, because they gave the ultimate question, which has then the effect of subsuming all the other factual questions which were not laid out explicitly. And didn't the trial judge expressly say that's what he was doing when he ruled on their motion to strike the ultimate question from the verdict form? I agree with that. I think the record is not a model of clarity in terms of what everyone thought they were doing when you read everything. But the judge was clear he wasn't going to give all of the questions that people said were factual questions. I think the judge understood he couldn't force a waiver of a jury trial. And what happened instead on the record is that the ultimate question was given, and the effect of doing so under Quaker City is not denial. I think Quaker City on that question governs. In his January 29th ruling he says, therefore, the court will submit to the jury the factual dispute as to the grand factors, and that's right after he outlines what all the grand factors are. Correct. And the reality is in the ultimate – and then the parties tried to do that in their lengthy and, in his view, prolix verdict form. And he said that's too long. I think that will confuse the jury. And so then he told them to come down to 300 words or less, which apparently they did. But he gave the ultimate question, and the legal effect of giving the ultimate question, to my mind, ends that question. Even if he's giving that question purely as an advisory matter? The legal part is clearly advisory by definition, and that's what he said in his ruling on the motion to strike. He said I'm going to give the jury the fact part, and I'm going to keep the legal aspect on top of it for me. That's what he said his intent was in the ruling on the motion to strike the jury, and that's what he did. And to hold otherwise in this case would be to say that he imposed a waiver of Wake Forest's undeniable right to a jury trial on those factual questions, and he can't do that. Let me ask you a question that your friend argued below, that the reason the judge should submit all these questions is because he cited to the Berkeley book. And that's something that you were instrumental in, right? So do you think that that's the mechanism the trial judge should have used? I don't think he followed it the way the book was intended, but the Berkeley book talks about different alternatives, one of which would be 49A, but one of which is 49B. And 49B says you do a general verdict of obviousness, but ask specific targeted questions as well. And I think what happened by a somewhat convoluted process below is they ended up with 49B because he gave the ultimate question and had additional interrogatories on top of it. But what Smith and Nephew is attempting to argue is that all of the additional factual elements of a Graham analysis beyond those narrow questions that ultimately were submitted were waived. And the law on waiver simply doesn't support that. And Quaker City is squarely inconsistent with that. So then with regard, if we get past the 49A issue, then the question comes down to… We'll expand your time, by the way, to some extent to allow a little bit fuller exploration of some of the issues. I appreciate that. And then we'll restore your full rebuttal time. But don't take that as a blank check. But take your honor's point. May I take maybe a minute or so to talk about the prior references because I do want to address them in whatever detail the court wishes to hear them. But I just have one question before you get there, and that is that, as I understand it, your view is that all of the claims are limited by the reference to the negative pressure. Is that right? Yes. Each of them actually calls out particular pressures, and that's a point I wanted to make sure I didn't miss. In addition to the treatment versus draining distinction that is present in the claims, each of the claims also has specific pressures that are called out. And there's no debate not only that Bogatinoff and Zamierowski don't have those pressures, but in Bogatinoff, there's even something more critical which ties back into the treatment versus drainage point. Bogatinoff used basically a baggie with oil. They called it Vaseline, but the record below was that that was really oil. And the record demonstrated that that created something that slipped and slided, not that created a seal. There's a sealing means limitation. There was plenty of prior art that disclosed the sealing. That's right. The sealing, well, there's two questions implicit in that question. One is the structures for sealing. The answer to that would be yes. In terms of actually providing a seal, the answer is no. Which is the function of, in the case of mean plus function limitations, yes, but structurally in the method claims, the answer is no. There was not a seal formed that was in any way meaningful. And the record on that is very, very clear. We're talking about a baggie with oil. And there's a reason for that. It's not just accidental. It's not… Why wouldn't somebody… I mean, that strikes me as strange. If you wanted to create negative pressure and you found that the oil caused you to lose the vacuum, wasn't there plenty of prior art that taught you to use a different methodology? The predicate of Your Honor's question is exactly the issue. What if they wanted to do it? The point is the conventional wisdom was not to create that seal because they thought it would damage the surrounding skin and tissue. And Bogotanoff, and this is the point I really wanted to try to make, Bogotanoff cited the prior art beers reference and said that provides pressure that's high. In fact, too high. It causes damage. I want to use a lower pressure because that's all I need to do to drain. And the lower pressure Bogotanoff uses is not within the claimed pressure ranges. So not only does it not… It's a different point than the Vaseline, right? It is a different point, but they're all related. The reason he's using Vaseline is he doesn't care about having a seal that can provide the right types of pressures because he's using it for a different purpose. His purpose is just to drain. And that was Zamierowski's purpose. That's why none of them cared about the pressure or wanted high pressure. In fact, to the extent they cared, they were explicitly on page one of Bogotanoff teaching away from the claimed pressure ranges because they thought it caused damage, which was the conventional wisdom of the day. Just enough pressure to drain, just long enough to drain, then remove because otherwise you'll damage the tissue. That is the opposite of what actually worked. That was the conventional wisdom. And so the predicate question, Judge Syke, in your question is if someone wanted to do that. The whole point is no one did. And Bogotanoff doesn't teach doing it for that purpose. Neither does Zamierowski. And none of the other prior art does. And the other evidence of record is clear. Your expert specifically testified that there was no motivation to combine these references. Is there testimony where he specifically said that Bogotanoff teaches away? Yes. That's cited in the blue brief, and I'll get the exact pages for you in rebuttal. And I do think a little bit of common sense and real world is relevant here. Bogotanoff was working in conditions in Russia that are not those of the United States. The evidence of record was clear about that. He moved to the United States. He worked in the ER in the United States, which had wounds. He never, ever used what he published, his technique in Russia, in the U.S. on those wounds. So it wasn't obvious even to him. And so if what's claimed obvious from Bogotanoff is not obvious to Bogotanoff, and there's extensive evidence in the record that supports why, I don't think it's really within the province or competence of this court to overturn all of that evidence. The same is true of Zhemirowski. Now, Bogotanoff was not, I guess, before the Blue Sky Court, but Davidoff was, I think. Exactly. And there's a debate in the briefs about how analogous they are, in our view, quite, but I'm not sure we need to decide that. All right. The one piece of art I'd like you to address, if you would, just briefly, but nonetheless I'd like to put it on the table for you, is Dr. Cheriker's patient, Ederholt. Yes. How do you deal with that piece of prior art? That's you referring to the one public use where there was a debate about whether it involved a fistula? Yes, the fellow with the chainsaw. It sounded unpleasant. Pretty grim. There are really, I think, two questions embedded in Your Honor's question. I'll answer each. One is the question of whether it was a wound or a fistula. Right. And the second is, whatever it was, was it drainage or healing, which I think both of those are relevant. Obviously, Cheriker-Jeter was at issue in Blue Sky, and Mr. Ederholt's condition was specifically addressed in the opinion in Blue Sky. Right. Now, not all of the evidence that was in this record was in that record, but the evidence that was in this record actually further supports the conclusion that this court reached in Blue Sky. Now, recall that this court in Blue Sky reached two conclusions. One was that there was a dispute about whether Mr. Ederholt had a fistula or not, and that there was sufficient evidence from which the jury could find that it was a fistula. But more specifically, and perhaps more importantly, because there the primary issue was wound. Here it's an issue, but not necessarily the primary issue, that Cheriker-Jeter, like the other prior references, was dedicated to draining, not healing, the wound. And in fact, it would be removed once the draining was accomplished. That's what Cheriker-Jeter was about. Your Honor's opinion in Blue Sky is explicit on the distinction and specifically calls out the distinction between draining and healing with regard to Cheriker-Jeter. The evidence here certainly supports that conclusion equally, if not more. And the evidence here, in answer to Your Honor's other question, supports equally, if not more, the argument that it was a fistula, not indeed a wound. And the new evidence that was present here that wasn't in that record was the 2,000 or so page record from the hospital. And the best, I think, that comes out of that for Smith and Nephew is the statement that was made, which was a bit of a negative pregnant embedded in it, that it was never, quote, diagnosed as a fistula. And we've cited this in the record, and the evidence from our expert, Dr. Orgel, was quite clear that says, although they never actually put that on, I've reviewed now that 2,000 page record, and it was a fistula. So I think, I hope that answers Your Honor's question. Thank you. I think we'd better hear from Mr. Wray at this point. We will give Mr. Wray an extra eight minutes if he needs it. If you could do that. Mr. Wray. Good morning, Your Honor. Needless to say, I completely disagree with the characterization of what happened below as outlined by Mr. Powers. And as the lawyer who handled the case below, I, of course, get a little defensive when I hear that the record is less than the model of clarity. First of all, the 300-word limitation I heard had absolutely nothing to do with the verdict form. That had to do with putting in a description of the contentions to assist the jury in the jury instruction. That had absolutely nothing whatsoever to do with the verdict form, number one. Well, you'll agree that the verdict form does not outline as specific questions every single one of the grand factors, correct? It listed all the grand factors that were still in dispute. As the district court wrote in its opinion, the only factual issues that were in dispute dealt with the differences between the prior art and the claimed inventions and the secondary considerations. There was no dispute on the level of skill, and there was no dispute as to the scope and content of the prior art. That is very important. If you look at the verdict form that KCI proposed, they proposed at the beginning of the case many, many questions under the heading scope and content of the prior art. The court ruled as a matter of law that all those questions, particularly the ones that were in debate, should be in my client's favor as a matter of law. All of the art is now prior art as a matter of law. But he only ruled which ones were prior art. In other words, which ones are available to be cited as prior art. He didn't say that he was ruling as a matter of law as to what the content and scope of those prior art references were. That is correct, but the language that was used in the verdict form submitted by KCI at the commencement of the trial was scope and content of the prior art. And those questions were all ruled in my client's favor. So it's a little unclear what they mean by scope and content versus scope. What the judge ruled on is that all of the items that you wanted to call prior art, you were allowed to call prior art. Correct. That's the only thing you ruled on. Correct. Well, that was the gist of their case below. They were fighting until the day before the charge conference that Paganoff was not prior art. They were fighting until the day before the charge conference that Aderholt, the patient, was not prior art. Those rulings were made. So you're saying that they waived the right to a jury on motivation to combine, teaching away, all those other underlying issues? That is correct. The judge does not impose a waiver of right to trial by jury. That is explicit in Rule 49A.3. The history of Rule 49A.3 is very, very important, which Mr. Powers is not acknowledging. There are three ways that Rule 49 allows this court to affirm. And it was specifically designed to overcome old Supreme Court case law that used to vacate judgments for inadequate findings by the jury. As a result, people were no longer using special interrogatories. The Fifth Circuit case, there's lots of Fifth Circuit law on this, and there's a reason for that. How do you get around the language in the court's written ruling where he says he's submitting all the grand factors, underlying factual grand factors, to the jury and refuses to strike the ultimate question? I don't know where you're reading. A10383. A10? Yes. This is Volume 2, and it's A10383. It's the last page of this page. Start page 10379 and go to A10383. Yes. At this point in the case, see, this was done, and the chronology is very important, and the great brief really doesn't give it in the correct chronology, and I regret that I haven't had a chance to respond to the standard review points raised for the first time in the reply brief. At this point, yes, my proposed verdict form prior to trial in January, the trial began February 4th. At this point, we assumed everything was at play. All the grand findings were still in dispute. You'll notice, though, when he writes his Jamal opinion, which is now post-trial, obviously, he then explains on A9 of the Jamal, here the scope and content of the prior art and the level of ordinary skill in the art are not contested. And then he continues, the only disputed factual issues presented to the jury were the differences between the claimed invention, that's question 5, and the prior art, and the secondary considerations of non-obviousness, all included in question 5. There is no doubt question 5, the answers to question 5 are binding. If you thought that this was a Rule 49A verdict, then why didn't you request that the court enter the findings that are required for Rule 49A, where the court is required to make very specific factual findings with respect to any issue that the court reserved? Well, first of all, the court and I had many discussions about his ability to make findings under Rule 52A. That is throughout the record, whether at the pretrial conference, at the charge conference, the post-trial hearing. But the judge never made 52A findings. Well… And you didn't move under 52, you moved under 50. Yes, and I want to give you the law that controls that issue. This court has already made clear that a Rule 50B motion after a Rule 49 verdict must be treated as findings under Rule 49A and not 50B. That's the Goodwall construction case. This court decided that. The opinion is written by Judge Rader. And I'd like to give that citation because that answers the question specifically that I don't really have a choice to call it Rule 50. If it's under Rule 49A, the court is free to make findings of fact under Rule 52. Free to or required to? He only needs to make the findings sufficient to support his judgment. And even if he doesn't, this is another way Rule 49A was written. Even if the court makes no findings, this court is to presume the findings in favor of the judgment and not the verdict. And that's when Mr. Powers has a standard of review in reverse. And that is also set forth in Rule 49A-3. So you see, Rule 49A-3 gives appellate courts three ways to affirm even an inadequate verdict. Three different ways. One, the waiver is imposed on the party who does not submit a question. That's the first sentence of A-3. A-3 is issues not submitted. Let's take teaching away, motivation to combine. Starting point, starting point. Brand new argument, never made below. A party waives the right to a… You're saying they never sought a teaching away question. Correct. They never sought a motivation question. Correct. That was a waiver. Correct. Correct. Even though they objected to use of a 49 verdict form. They rejected the use of 49A in general. And they went and said, do black box. Now that's not on appeal. They're not challenging anything the district court did on this appeal with regard to the procedure. Remember, their blue brief does not challenge the claim construction, the jury instruction, the verdict form at all. This was only raised in the gray brief under the guise of the standard of review. So let's be very clear. The use of the judge's procedure and the verdict form was completely and absolutely stipulated to, and they even called appellate counsel down to handle the charge conference. Vinnigan Henderson sent lawyers. Mr. Putney, when you read the transcript, is the appellate lawyer who helped handle the appeal the last time we were here. But their point, I take it, is not that what was done was inherently objectionable. It was that what was done did not fall within the ambit of Rule 49A, but rather was in the form of a Rule 49 type procedure in which you have a general verdict with answers to written questions. So the fact that you're not saying the whole thing was done wrong doesn't seem to me to address that point. Okay, let me address the 49B. You will see no mention of 49B anywhere at any time in this record. Never, once. The first time 49B is ever mentioned is in a footnote in the gray brief on appeal. Number two, this court – District judges don't use the phrase 49B when they prepare verdict forms. I don't think I ever once in 16 years used the phrase 49B, but every verdict form I used was essentially one. You don't define what you're operating under. The verdict form itself defines what you're operating under. Correct. And 49B is a general verdict, and I've never had a general verdict in a patent case, and I doubt Mr. Powers ever has. A general verdict is a question. We don't have that. We do not have a general verdict. And in fact, let's look at what the court did. Isn't the question what the court was doing when it said that the obviousness thing would be advisory, whether he meant that the legal question would be advisory, which of course it had to be, or whether he meant that the whole determination about obviousness would be advisory? He meant question six is advisory. The question is advisory. How do we know that? Okay. First of all, there's a long history of this case. There's lots of citations I need to give you to really fully answer that question. First of all, the prior appeal. The prior appeal was up on certiorari, and we made the argument that we, it was the Blue Sky, Medilla defendants, and Smith and Nephew was not a party to the prior appeal. But there the fight was over whether the judge exercised his independent legal obligation to determine obviousness. That issue was raised to the Supreme Court of the United States on certiorari. Mr. Putney's and the Finnegan-Henderson team wrote an orange brief to the Supreme Court, and this was the brief, and this was the basis for my plea to use Rule 49A, because this brief basically said the defendants waived that argument by not asking for an advisory verdict and not asking for Rule 49 questions. So when the next trial came, I was the first one to teach the court that obviousness is a question of law and that we are not waiving like the other defendants apparently did, and we demanded Rule 49A questions. But I read that entire colloquy with the court, and the court kept saying, I get your point that there's certain things I have to decide, but I'm not doing that. He said, I'm not going to ask that many questions to the jury. He said that in the dialogue where you're telling him he's supposed to do this. He said no. I'm not sure which conference you're referring to. January 25th. Okay, that's pretrial. Okay, but the charge conference is what matters. Rule 49A, and the case law is clear, that you have to demand submission, and the demanding of submission occurs at the charge conference a month later. And Mr. Puckney and I were in agreement over the verdict form, and they're not challenging the verdict form. They're not challenging the sufficiency of the verdict form. That is not on appeal. So we have a stipulated verdict form. We have a stipulated set of jury instructions. So these are very interesting issues, and Mr. Puckney and I did present to the district court that there's no federal circuit case using Rule 49A with an advisory verdict. Council agreed there was no case like ours, and to now hear that it's just like Quaker City in 1984 or 86 is just totally contrary to the record. We made it very clear, because of Mr. Powers' co-authored book, that this is a good time to try using Rule 49A. And Rule 49A is throughout the record, and even at the charge conference, Mr. Puckney understood when the judge said, if you don't ask the question, I make findings of fact and conclusions of law. That's Rule 52A language. And Mr. Puckney responded, I understand your honor. There was no question by Mr. Puckney and me and Mr. Macon and Mr. O'Neill. When you read the transcript, all the lawyers are KCI Wake Forest lawyers, and I am the only one speaking for Smith and Nephew. Puckney is their lawyer, and Puckney agreed and understood when the judge said, if you guys don't give me questions, I make findings of fact. So we're supposed to ignore what we've said in Quaker City gear? And even though there was the ultimate question asked on the verdict form, that that doesn't matter? Quaker City is inapplicable to the extent that appellants are relying upon implied findings due to Question 6. If we had a situation in which there had been no reference to an advisory verdict on obviousness, we would have to imply findings to support the jury's verdict on obviousness, correct? If they were supported by substantial evidence to justify the outcome. Yeah, that'd be a different case. So the question is, what was meant by saying that the obviousness verdict was advisory? It meant the judge was deciding obviousness, and Question 6 was of no force in effect. How do I know that? Where did the judge explain what he meant by advisory before the Jamal decision? Well, the charge conference would be the best place to look for that. So what exactly did he say? Okay, let's go to A22984, where Mr. Tuckney and Judge Ferguson are having a very nice discussion, which I was just referring to. A22984, that's Volume 3, which is the end of the trial transcripts. And the court says, Mr. Tuckney's argument at the top of 22984, don't follow this book. This book is written by a bunch of defendant lawyers in Northern California, and don't follow it. That's basically his argument. But the judge responds and says, well, I know it's just been published, but it does talk about the Supreme Court case, a 1966 Supreme Court case, Graham v. John Deere. It is obvious, if I just put an obvious question, that it is only advisory. Then I have to go back through. Now there, I can see. He meant it was a question of law. I decide obviousness. But he continues. And Mr. Tuckney interrupts and says yes, and then the court continues. And I have to write up this thing myself. So you know it would be nice. You know, perhaps I'm being lazy here, but you know district courts have a lot to do. And I see this case as really requiring, if I just put obviousness, I have just basically got to, basically, findings of fact and conclusions of law at that point. So he's telling Mr. Tuckney's, you don't agree on the questions to go to the jury. I am making findings of fact. I mean, a jury in some ways, this is another beautiful line, the jury in some ways has just been, you know, just sort of been beside the fact. The jury is beside the fact. That's what he's saying. It doesn't matter what they do. I mean, if I don't find some way to do it, then it is really not going to make any difference what the jury says. That's pretty good language too. Right. This is his sole discussion about why he doesn't want to do this. Why? He's not saying that he's making the finding that the jury was beside the fact. He's saying if I do what you want me to do, that's effectively what I'm rendering them. I don't quite understand. I know what he's saying to Mr. Tuckney is if you and Mr. Ray don't come up with questions for the jury and agree on them, I'm going to make findings of fact. I want to get some help from the jury, but I need you folks to agree and to submit questions. And we did agree. We worked it out. We did have a caucus with the judge. The judge came to our hotel. We had a stipulated verdict for him. There's nothing unclear on the record about that. You don't see any objection being made by Wake Forest or KCI. We had an agreement on all trial practice at this point. And then it continues where Mr. Tuckney is arguing over how many questions. And then he comes my way and he basically agrees. Let's have it on a claim by claim basis, reference by reference. That's eight times three is 24 questions. We had total agreement. The judge was very happy the night at the Hilton, and you'll notice there is no preservation of any objection whatsoever. And more importantly, there's no objection on this appeal. So, Judge O'Malley, your questions sound as if the appellant is complaining about the verdict for him. No, I didn't say that. Well, your question also sounds like the judge did something wrong or something was frustrated. Yeah, he was frustrated. No, I didn't say that either. Don't interpret my questions. Just make your argument. My argument is that the issues that are being raised with regard to the adequacy of the verdict form are not on appeal. They were not raised. We have a joint set of jury instructions. We have joint verdict form. We have a joint claim construction. We agree on everything, and these arguments about waiver only came up by way of standard of review. Is there any other place in the record where he explains, where the district court explains what he meant by an advisory verdict? Well, if we continue in that charge conference, he later goes on and says, Thank you very much. For now, I'm going to overrule those objections and give the matter to the jury. And as I say, so much of what the jury does may not be binding as a final matter here, and that's at A23062. So much of what the jury does may not be binding as a final matter here, but we'll just do the best we can. That's in the charge conference as well. In the misuse trial, we had another trial after the jury trial, which I think is another really admission that the parties understood question six was not binding. And in fact, at the misuse trial, which was in July, so now we're after the jury trial in February, before the Jamal decision in October, the parties had a trial on patent misuse, an equitable proceeding. And Kurt O'Neill, another lawyer for Wake Forest and KCI, began to tell the judge that you're bound by the jury verdict in this misuse proceeding. And he was simply explaining the Beacon Theater line of cases that obviously in a subsequent equitable proceeding, you're bound by determinations by the jury. Well, he said that a few times, and he said, you're bound by the jury verdict, bound by the jury verdict. It caught the judge's attention, and the judge on A14387, this is volume two. He said, I need to make sure, are you saying in this regard, this is at the bottom of page 157 of the transcript at A14387, volume two. He stops Mr. O'Neill and says, I need to make sure, are you saying in this regard the jury verdict on obviousness is not advisory? It is mandatory, so now he's using the word mandatory to clarify that he of course was using the word advisory in accordance with the federal rules of civil procedure. He never was using it in this hybrid kind of way. He knows what advisory verdict is. This judge was very proud of the fact that he tried over 400 cases, and he was very, very knowledgeable on trial practice. And he questioned O'Neill and said, are you saying it's mandatory? And Mr. O'Neill had to fess up. He said… They're not arguing. No one's arguing that the ultimate determination was mandatory on the judge. They're arguing that question six is binding except to the extent that it encompasses the question alone. They're basically arguing it's like every other case. The underlying implied facts are binding. Correct. They're arguing that my case before Judge Ferguson is like any other case on question six. Do you agree with Mr. Powers that if you're wrong on this point that you lose your appeal? No, because this court easily could have made the determinations as a matter of law. What happened on the merits was the court basically said, Dr. O'Neill, you're testifying contrary to the claims construction, and you testified contrary to the references and the evidence. He could have made those statements as a matter of law under Rule 50. Before you get to that, I just want one more question on this advisory. In the Jamal opinion, did the district court address the issue that we're arguing about now, and that is what he meant by saying that it was advisory? No, he just called it advisory. Why didn't he address that question? Was that not briefed before him on the Jamal? Yes, we made it very clear, particularly in our briefing. Both sides made it clear, right? Well, no. I mean, they were saying, you're bound by the implied findings. No? In the brief? Yes, and we came back in our reply briefing and said, no, it's advisory, and we cited the two leading Fifth Circuit cases, Sheila Shine and Frosty, which say an advisory verdict is a nullity, no force effect. It's sort of odd that he didn't address it in the Jamal opinion, isn't it? Well, because nobody was really asking him to make additional findings. We attacked the findings that the jury did make. But in terms of what he meant initially, it's odd that he didn't clarify what he meant by saying that it was advisory. No, it's not odd at all. It was understood by everybody in that courtroom. Absolutely understood throughout. But it was argued in the Jamal. It was argued. Both sides argued. You argued it was advisory. The other side said he's bound by the implied findings. No, they didn't, and that's what I was getting at. If we go to AA14388, they argued – this is post-briefing. This is in a misuse trial. And in fact, when the judge asked – What about the briefing on the Jamal? Didn't they argue in the briefing on the Jamal that the jury had made implied findings on the obviousness question? No? They never acknowledged it was advisory at all. Let's ask the question. Did they argue that there were implied findings that were binding on the district court? I think they just treated it like a binding verdict. They just applied the regular standard of review. So my recollection is there was no acknowledgment of the significance of the issue of the advisory nature of the verdict. They just buried their head in the sand and acted like the word advisory was made up, even though it's in the Federal Rules of Civil Procedure twice. So the answer to your question is they just bypassed the issue. But they were arguing that there were implied findings, right? Yes, and I came back. Well, I need to see their brief. I don't recall if they actually relied on implied findings. They did. I assume they did. It's in the brief. So then let's look at my response. My reply was Roman numeral one at A457, number one, heading. KCI ignores the advisory nature of the jury verdict on obviousness. That's my heading. And I go through the leading cases and I take them to task that they are assuming question six was binding. It wasn't. And the court refers to it as advisory in his Jamal opinion. So it was fully understood. I did mention – I want to give – One more point. I just want to give a citation to the cases I mentioned. The Watkins case, which explains the purpose of Rule 49A3 from the Fifth Circuit, which is the leading case, is at 994 Fed Second 253 at 258, which explains why appellate courts sustain Rule 49A3 under 49A3. And the Goodwill case I explained where it has to be treated under Rule 49 and not Rule 50. The Goodwill case by this court is 991 Fed Second and the discussion is at 757. Thank you, Mr. Ray. Thank you, Your Honor. If I may, I promised you I would give you the citations on Bogotnov teaching away. That's at pages 28 to 30 of the blue brief and 39 to 40 of the blue brief. That contains all the citations. I'd also like to respond to two questions Judge Dyke raised. First, why did the district court in his Jamal opinion not refer to this 49A question in an advisory question? That's because 49A was not mentioned in their Jamal briefing. The Jamal argument on the briefs was a substantial evidence traditional Jamal Rule 50 run-of-the-mill process. They argued no substantial evidence. We argued explicit and implicit findings. Your Honor has asked a question about whether that was actually argued. A good example of that is at A426 where our Jamal brief said when considering a motion for Jamal in obviousness, the court must defer to both the explicit and implicit factual findings of the jury. Did they argue the opposite? They argued that it was advisory without being very specific about that. What they did not do was say you're bound by 49A, 49A3 provides waiver, et cetera. None of that was raised. But would they argue that there were no binding implicit findings? They did not. I can't make a representation about that, the tenor of the argument. I can't make a representation about everything they said. The tenor of the argument was there's no substantial evidence. I think that was 28 times in their briefing, 28. And they certainly asked the judge to find certain things not in an explicit Rule 52 sense, but they asked him to reweigh the evidence but not in a sense of you're empowered to because none of this is binding at all. But rather to say that the jury could not reasonably have concluded with respect to finding ABFC. Precisely. And the second question that Judge Zyk asked was is there anything in the record that tells us what the district court meant by what was advisory? And the answer to that I think is found in his order denying their Rule 49 motion at page A10383 where he says, quote, additionally he says the court will submit to the jury the factual disputes of the gram factors and a secret advisory verdict on obviousness from the jury. And the final statement of that page says additionally the jury verdict form shall specifically ask the jury to determine the underlying gram factors and make a final determination of obviousness that the court will consider as advisory. And I think the word final is referring to the legal conclusion on top of the underlying gram factors. Well, except that he seemed to contemplate that the extent that there were fact issues, those would be submitted as questions. I think early on that was what he was thinking. As we discussed the evolution of it, he thought that was too much to give to the jury. And so the ultimate question was then used as a surrogate for that. One point I do want to make is the snippets that counsel quotes from this particular portion or that particular portion about what Mr. Putney's meant or what the judge meant in a particular excerpt. Those don't control Quaker City. The answer is that once you give that ultimate question on a verdict form, you're done. Yeah, but the problem is that Quaker City would be in point except for the advisory aspect of this thing. And the question is what's meant by that. I don't think that's right. I see Your Honor's point. The only way you get there is to find that the parties agreed to waive consideration by the jury of the factual gram factors. And there's no evidence to support that on this record. But everybody was saying, we were saying consistently, we want the jury to decide the factual gram factors. So why didn't you submit the other gram factors like motivation and teaching a way to the jury? We submitted 28 pages of them and the judge said shorten it. And the jury instructions charge on all those items. That's the next point I wanted to get to is the jury instructions do cover all of that. And I do want to cover one point that counsel argued that the district court found that, quote, the scope and content of the prior art were undisputed. That is a statement in the Jamal opinion, but it's false. The reality is the scope of the prior art was undisputed at this point. We're not saying that these three references aren't within the ambit or purview of the prior art. The content of the prior art, though, under W.L. Gore and every other case this court has decided on that, includes these teachings taken as a whole, not one snippet of it, but taken as a whole, whether those teachings allow combination, etc. That is squarely within the factual question of the content of the prior art. That was squarely disputed and there was, and the jury's implicit finding on that factual question is dispositive. The district court, incidentally, made no finding on that question of the motivation to combine. And there wouldn't be evidence in the record to support such a finding if he had made it. Were the briefs submitted on the Jamal? They're not in the appendices that we have, right? They are. I'm not sure if they're there in their entirety, but certainly excerpts of them. They're on PACER, I assume. I assume they are on PACER, yes. And if your honors wish it, we can supplement the record. Well, the only problem with PACER is that frequently in patent cases, a lot of these things are redacted. So if your honors wish the entirety of the briefs… They need to come back to you if we find that we can't get them all. If it's material, we'd be happy to, obviously, I'm sure the parties would jointly submit it. But I do want the place… I think it might be helpful to have them. The place where your honors question, where Judge Dyke's question goes, would be to an implicit waiver by Wake Forest of its right to jury trial on the remaining disputed questions of the content of the prior art. And the law on waiver is much more harsh than that implicit waiver would support. The only argument they've made is that although we asked for findings on all those questions, although the district court said he would give the ultimate question, which of course he did, and Quaker City dictates what the result of that would be. Although all of those things were consistently done, somehow at this 10 o'clock meeting at the Hilton, we all of a sudden waived our jury right, which is off the record, not done by anything. And we have no record of what was going on or what was said. And all we have is Mr. Ray's word for it, that that was waived. I suppose you could have… It's a little odd that some of the Graham factors are in questions and others aren't, and that there's no record of having asked for other questions. Well, the second part is not true. In the record, and we've cited it, there is a record of all of the additional questions. I think one of the drafts is 28 pages long. And that's the one where the judge said, this is way too long. I'm just not going to give this. What were the additional questions in there? Did they cover… They covered the waterfront of what you'd normally see in a patent. The page in the appendix of that. I will get… They're cited in the gray brief. So I will get that for you. And when the judge said these are too long, and that wasn't at the hotel meeting, right? That was before the hotel meeting. That's where he said… Is that on the record? Where he says it's too long, that's in the record. And I'll give you both. All of this is discussed at length at pages 11 through 14 of the gray brief. And the too long portion is really discussed at page 12. Where are these additional questions? Where do we find those? That's discussed in the first full paragraph on page 12 of the gray brief. And the sites are A… No, the appendix. That's what I'm saying. A5955 through 5982. A9669 through 9674. A13470 through… Could you show me where there were questions? Let's just take two of them, for example. Where's the question about teaching way? Where's the question about motivation combined? I would be happy to. Let me… Can I get copies of those pages? So, let's take A5955. A5955 is the beginning of, actually, A5936, although some of it's pulled out. So, A5936 is one of the drafts of Wake Forest verdict form. And question 16 just asks… That version just asks the question of scope. Question 17 is differences. And that goes through, say, question O34, 35. Question 36 is secondary factors of non-obviousness. And question 38 is the ultimate question of obviousness. So, there isn't any specific question about teaching away. Oh, there's no specific question on using the word teaching away. No, of course not. Or motivation. Or motivation, but that's within the question of content. And there were instructions, of course, on that question. There were jury instructions on that issue. No, but what's clear is that whatever the significance of the judge saying this is too long, you hadn't initially thought questions on teaching away and motivation to combine. On that question and those words, certainly not. That would be subsumed within the question of obviousness. You're right about that. But what Quaker City teaches is that all of the factual gram factors that are subsumed within the conclusion of obviousness are presumed to have been found by the jury in favor of the verdict holder. Content of the prior art, which includes teaching away and motivation to combine and what it teaches, all of that is squarely within that. There was substantial evidence to record to support that finding. And on that basis, this court should affirm. Very well. Thank you. The case is submitted.